Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Frank P. Tiscione, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY
COMPANY,

                            Plaintiffs,

              -against-

ALEXANDER KOLESNIKOV, M.D., ALEXANDER
KOLESNIKOV MEDICAL, P.C., SABINA SHAFEI, and
YOUSEF SHAFEI,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:_____ (    )

**Plaintiff Demands a Trial by
Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, hereby allege as follows:

## NATURE OF THE ACTION

    1.     This action seeks to recover more than $1,445,000.00 that Defendants wrongfully

obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-

fault insurance charges relating to medically unnecessary, illusory, and otherwise unreimbursable

healthcare services, including patient examinations and diagnostic testing (collectively, the "Fraudulent Services"), that allegedly were provided to New York automobile accident victims ("Insureds") at a "multidisciplinary" clinic located at 5321-5329 Flatlands Avenue, Brooklyn, New York (the "Flatlands Clinic").

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $737,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Defendant Alexander Kolesnikov Medical, P.C. because:

(i)      the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(iii)    the fraudulent, pre-determined treatment and billing protocols were subject to the direction and control of persons that were not licensed to practice medicine, resulting in the performance and billing for unnecessary and inflated charges to GEICO.

3.      The Defendants fall into the following categories:

(i)      Defendants, Sabina Shafei ("Sabina"), and Yousef Shafei ("Yousef") are laypersons that have controlled the operation and management of the Flatlands Clinic, been directly involved in the operation and management of Alexander Kolesnikov Medical, P.C., and were the catalysts behind the design and implementation of the fraudulent billing and treatment protocols associated with the Fraudulent Services for the purposes of billing such services to automobile insurance companies, including GEICO.

(ii)     Defendant Alexander Kolesnikov Medical, P.C. ("Kolesnikov Medical"), is a medical professional corporation through which the Fraudulent Services purportedly were performed and billed to automobile insurance companies, including GEICO.

(iii)   Defendants Alexander Kolesnikov, M.D. ("Kolesnikov") is a licensed medical professional who purported to own Kolesnikov Medical and purported to perform some of the Fraudulent Services.

4.   As discussed below, Defendants at all relevant times have known that:

(i)   the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)   the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(iii)   the fraudulent, pre-determined treatment and billing protocols were subject to the direction and control of persons that were not licensed to practice medicine, resulting in the performance and billing for unnecessary and inflated charges to GEICO.

5.   As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed to GEICO.

6.   The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to-date that Defendants submitted, or caused to be submitted, to GEICO.

7.   The Defendants' fraudulent scheme began as early as 2013 and has continued uninterrupted through present day.

8.   As a result of Defendants' scheme, GEICO has incurred damages of more than $1,445,000.00.

## THE PARTIES

### I.   Plaintiffs

9.   Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Maryland

corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

## II.  **Defendants**

10.     Defendant Sabina resides in and is a citizen of the State of New York.  Sabina is not and has never been licensed to practice medicine. Sabina has, at all relevant times, controlled the operation and management of the Flatlands Clinic, been directly involved in the operation and management of Kolesnikov Medical, and along with Yousef, been the catalyst behind the design and implementation of the fraudulent billing and treatment protocols associated with the Fraudulent Services.

10.     Defendant Yousef resides in and is a citizen of the State of New York.  Yousef is not and has never been licensed to practice medicine. Yousef has, at all relevant times, controlled the operation and management of the Flatlands Clinic, been directly involved in the operation and management of Kolesnikov Medical, and along with Sabina, been the catalyst behind the design and implementation of the fraudulent billing and treatment protocols associated with the Fraudulent Services.

11.     Defendant Kolesnikov resides in and is a citizen of New York. Kolesnikov was licensed to practice medicine in New York on July 9, 2009, and purports to provide many of the Fraudulent Services through Kolesnikov Medical.

12.     Defendant Kolesnikov Medical is a New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to automobile insurance companies, including GEICO.

**JURISDICTION AND VENUE**

13.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

14.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

15.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

16.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**ALLEGATIONS COMMON TO ALL CLAIMS**

**I.      An Overview of the No-Fault Laws and Licensing Requirements**

17.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

18.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

19.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

20.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").   In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

21.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they are unlawfully incorporated or fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

22.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

(Emphasis added).

23.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

24.     Unlicensed non-physicians may not: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

25.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently incorporated, fraudulently licensed, or if it engages in unlawful fee-splitting with unlicensed non-professionals.

26.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that health care providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and/or local laws.

27.     Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

28.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

29.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    Defendants' Fraudulent Scheme

30.    Beginning in 2013, and continuing through the present day, Defendants have masterminded and implemented a series of interrelated fraudulent schemes in which they billed GEICO and other automobile insurers for millions of dollars in No-Fault Benefits they never were entitled to receive because the services were medically unnecessary and otherwise unreimbursable.

### A.    Historical Background and Defendants' Current Fraudulent Scheme

31.    Sabina and Yousef have a history of controlling locations and associated professional corporations to submit large-scale fraudulent no-fault billing to New York automobile insurers, including GEICO.  Prior to operating from the Flatlands Clinic, Sabina, and Yousef engaged in a series of similar fraudulent no-fault insurance schemes.

32.    Sabina and Yousef began their fraudulent no-fault scheme through the operation and management of another "multidisciplinary" clinic located at 8008 Flatlands Avenue, Brooklyn (the "8008 Location").

33.    In connection with the fraudulent scheme, Sabina and Yousef caused professional corporations to implement large scale fraudulent treatment and billing protocols designed to defraud automobile insurers.

34.    After years of operating the 8008 Location and submitting millions of dollars in fraudulent no-fault claims through the professional corporations that operated from the location, Sabina and Yousef "closed up shop" and like thieves in the middle of the night, moved all of

their operations to 1642 West 9th Street, Brooklyn ("1642 West Location") for the purposes of continuing the fraudulent scheme.

35.     As with the 8008 Location, Sabina and Yousef caused the professional corporations at the 1642 West Location to implement large scale fraudulent treatment and billing protocols designed to defraud automobile insurers on a large scale basis.

36.     Shortly after the operations at the 1642 West Location started to gain traction, automobile insurers began to question the legitimacy of the healthcare services being performed and whether Sabina and Yousef were directly involved in the operation and management of those professional corporations, including the billing and treatment protocols that were being questioned.  Again, at some point in time, Sabina and Yousef "closed up shop" and moved all of their operations to the Flatlands Clinic for the purposes of continuing the fraudulent scheme.

37.     Prior to Kolesnikov Medical operating at the Flatlands Clinic, Universal Medical of NY, P.C. ("Universal") was the main healthcare provider at the location. Universal was owned at one time by Shawn Yunayev, M.D., the brother of Sabina.

38.     Universal was then transferred to Jason Halper, M.D., who in 2017 sued Sabina for tortious interference with business relations. See Jason Halper, M.D., et al. v. Sabina Shafei, et al., Index No. 524028/2017 (Sup. Court, Kings County). In this action, Dr. Halper alleged the following:

- Universal's corporate records were in possession of Sabina;

- Sabina was the office administrator at the Flatlands Clinic;

- Universal's corporate shares were transferred to Dr. Halper from Sabina's brother, Shawn Yunayev, M.D.;

- Sabina removed and locked away Dr. Halper's medical records pertaining to patients at the Flatlands Clinic;

- Sabina arranged to have another physician take Dr. Halper's place at the Flatlands Clinic.

39.     Furthermore, the incorporation for Kolesnikov Medical was undertaken by Erik Krupnik, CPA which is the accountant for Sabina and Yousef. In addition, GEICO's investigation has revealed a kickback and/or illegal financial arrangement between and among Defendants.

40.     For example:

- Sabina is the office administrator at the Flatlands Clinic.

- Kolesnikov Medical's sublease with Universal contains language modifying the rent when Kolesnikov Medical's receivables are low and allows Kolesnikov Medical to renegotiate rent if their profit falls under a certain number.

- Kolesnikov testified that he paid over $55,000 to Star Bright Service, Inc. for construction costs at the Flatlands Clinic.

- Star Bright Service, Inc. is owned by Yousef and was incorporated by Erik Krupnik.

- Kolesnikov invested monies for a 20% share of a surgical center being constructed in the basement of the Flatlands Clinic.

- Advanced Anesthesiology of NY, P.C. d/b/a Total Anesthesia Provider, owned by David Shabtian, D.O., also operates from the Flatlands Clinic, specifically in the basement of the Flatland Clinic.

- David Shabtian, D.O. testified that there was no ambulatory surgical center in the basement of the Flatlands Clinic.

- David Shabtian, D.O. also testified that he paid over $6,000 to Star Bright Service, Inc.

- Although Kolesnikov pays the salary of the billing staff, assistants, and receptionists at the Flatlands Clinic, he has no authority to hire these employees.

- Kolesnikov, Yousef, and Sabina jointly own property in Brooklyn which they bought in 2017, presumably to conceal their ill-gotten gains.

41.     The profits earned by Kolesnikov Medical were siphoned off by Sabina and Yousef through bogus lease agreements and construction costs. In reality, Defendants Sabina and Yousef retained revenue from Kolesnikov Medical in contravention of New York State law.

**B.     Defendants' Fraudulent Treatment and Billing Protocol**

42.     The Insureds in the claims identified in Exhibit "1" whom Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, the Insureds did not suffer from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

43.     Even so, Defendants purported to subject Insureds to a medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that they could submit through Kolesnikov Medical to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

44.     Defendants purported to provide their pre-determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentment, or – in most cases – the total absence of any actual medical problems arising from any actual automobile accidents.

45.     Each step in Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

46.     Insureds that treated at the Flatlands Clinic first underwent an initial examination from Kolesnikov Medical.  As a result, Kolesnikov and Kolesnikov Medical diagnosed Insureds with conditions that vary little and the examinations invariably led to further medical testing. For example, the examinations invariably led to range of motion and computerized muscle tests ("ROM/MT") and outcome assessment testing ("OAT"), performed by Kolesnikov Medical. In addition, many Insureds were subjected to nerve conduction velocity studies ("NCVs") and electromyography tests ("EMGs") performed by Kolesnikov Medical.

47.     No legitimate licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. Rather, Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to profit from the fraudulent billing submitted to GEICO and other insurers.

**1.      The Fraudulent Initial Examinations**

48.     Pursuant to Defendants' pre-determined fraudulent treatment protocol, Defendants purported to provide Insureds with an initial examination, the first step in the Defendants' fraudulent treatment protocol. The initial examinations essentially were performed as a "gateway" in order to provide Insureds with pre-determined diagnoses to allow Defendants to then provide the laundry list of Fraudulent Services.

49.     Kolesnikov Medical typically billed the initial examinations under CPT codes: (i) 99205, typically resulting in a charge of $236.94; (ii) 99244, typically resulting in a charge of $236.94; or (iii) 99245, typically resulting in a charge of $299.26.

50.     The charges for the initial examinations were fraudulent in that the examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the fraudulent treatment protocol established by Defendants.

51.     Furthermore, the charges for the initial examinations were fraudulent in that they misrepresented the nature and extent of the initial examinations.

52.     In addition, pursuant to the New York Workers' Compensation Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, when Kolesnikov Medical submitted charges for initial examinations under CPT code 99245 and 99205, they represented that: (i) they took a "comprehensive" patient history; (ii) they conducted a "comprehensive" physical examination; and (iii) they engaged in medical decision-making of "high complexity."

53.     Further, according to the Fee Schedule, when Kolesnikov Medical submitted charges for initial examinations under CPT code 99244, they represented that: (i) they took a "comprehensive" patient history; (ii) they conducted a "comprehensive" physical examination; and (iii) they engaged in medical decision-making of "moderate complexity."

### (a)     Misrepresentations Regarding the Performance of Examinations

54.     Pursuant to the Fee Schedule, the use of CPT codes 99244 and 99245 to bill for an initial patient encounter represents that the examining physician performed a "consultation" at the request of another physician or other appropriate source.

55.     However, Defendants did not provide their purported "consultations" – to the extent that they are provided at all – at the request of any other physicians or other appropriate sources. Rather, to the extent that the putative "consultations" were performed in the first instance, they were performed solely as part of Defendants' fraudulent treatment protocol, in order to generate billing for Kolesnikov Medical.

56.     In keeping with the fact that Defendants did not provide their purported "consultations" at the request of another physician or appropriate source, the supposed "results" of the putative "consultations" were not transmitted back to any referring physicians or other appropriate sources. Nor were the supposed "results" of the putative "consultations" incorporated into any of the Insureds' treatment plans, or otherwise acted upon in any way.

57.     In fact, Kolesnikov testified at an examination under oath on behalf of Kolesnikov Medical on January 31, 2014, that he never asked his patients about their referral source or if another physician requested the consultation.

58.     Pursuant to the Fee Schedule, the use of CPT codes 99244 and 99245 to bill for a patient consultation represents that the physician who performed the consultation submitted a written consultation report to the physicians or other appropriate sources who purportedly requested the consultations in the first instance.

59.     However – and, again, in keeping with the fact that Defendants did not provide their purported "consultations" at the request of another physician or appropriate source – Defendants did not submit any written consultation report to any referring physician or other healthcare provider.

60.     In fact, Kolesnikov testified that he never prepared a written report to any referring physician.

61.     In the claims for purported "consultations" identified in Exhibit "1", Defendants misrepresented the underlying services to be consultations billable under CPT codes 99244 or 99245 because such consultations are reimbursable at a higher rate than commensurate patient examinations.

**(b)    Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

62.    What is more, in every claim identified in Exhibit "1" for purported initial "consultations/examinations" under CPT codes 99245, 99244, and 99205, Defendants misrepresented and exaggerated the amount of face-to-face time that the examining physicians spend with the Insureds or the Insureds' families.

63.    Pursuant to the Fee Schedule, the use of CPT code 99245 typically requires that the physician spend 80 minutes of face-to-face time with the Insured or the Insured's family.

64.    Furthermore, the use of CPT codes 99244 and 99205 typically requires that the physician spend at least 60 minutes of face-to-face time with the Insured or the Insured's family.

65.    Though Kolesnikov Medical routinely billed for the initial examinations under CPT codes 99245, 99244, and 99205, no physician associated with Defendants ever spent 60 minutes of face-to-face time with the Insureds or their families during the initial examinations, much less 80 minutes. Rather, the initial examinations rarely lasted more than 20-30 minutes, to the extent that they were conducted at all.

66.    In keeping with the fact that the initial examinations rarely lasted at least 60 minutes, Kolesnikov Medical used pre-printed, checklist forms in purporting to conduct the putative "consultations/examinations."

67.    The checklist forms that Defendants used in purporting to conduct the examinations set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

68.    All that was required to complete the boilerplate forms was a brief patient interview and a perfunctory physical examination of the Insureds, consisting of basic range of motion, muscle strength, and incomplete neurological testing.

69.     These interviews and examinations did not require any physician associated with Kolesnikov Medical to spend more than 30 minutes of face-to-face time with the Insureds, let alone 60 or 80 minutes.

70.     In the claims for initial "consultations/examinations" identified in Exhibit "1", Defendants falsely represented that the putative "consultations/examinations" involved at least 60-80 minutes of face-to-face time with the Insureds or their families, because consultations that entail at least 60-80 minutes of face-to-face time with the Insureds or their families are reimbursable at higher rates than examinations that require less time to perform.

### (c)     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems

71.     What is more, in the claims for initial medical examinations under CPT codes 99244 and 99245 that are identified in Exhibit "1", Defendants misrepresented the severity of the Insureds' presenting problems.

72.     Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, the use of CPT codes 99244, 99245, and 99205 typically requires that the Insured presented with problems of moderate-to-high severity.

73.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderate to highly severe, and thereby justify the use of CPT codes 99244, 99245, and 99205 to bill for an initial patient examination.

74.     Pursuant to the CPT Assistant, the moderate to highly severe presenting problems that could support the use of CPT codes 99244, 99245, and 99205 to bill for an initial patient examination typically are severe problems.

75.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

76.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, in the substantial majority of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

77.    To the limited extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital as the result of their accidents, they virtually always were briefly observed on an outpatient basis and released after a few hours with, at most, a minor sprain or strain diagnosis.

78.    To the limited extent that the Insureds in the claims identified in Exhibit "1" experienced any injuries at all as the result of their automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains.

79.    The vast majority of soft tissue injuries such as sprains and strains resolve after a short course of conservative treatment, or no treatment at all.

80.    Even so, in the claims for their purported "consultations/examinations" identified in Exhibit "1", Defendants virtually always billed for the putative "consultations/examinations" using CPT codes 99244, 99245, and 99205, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

81.    In the claims for purported initial "consultations/examinations" identified in Exhibit "1", Defendants falsely represented that the Insureds presented with problems of moderate to high severity to create a false basis for their charges for the putative

"consultations/examinations" under CPT codes 99244, 99245, and 99205, because evaluations billable under these CPT codes are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

82.     In the claims for purported initial "consultations" identified in Exhibit "1", Defendants also falsely represented that the Insureds presented with problems of moderate to high severity to create a false basis for the other Fraudulent Services that Defendants purported to provide to the Insureds, including EMG and NCV tests.

**(d)     Misrepresentations Regarding "Comprehensive" Patient Histories**

83.     Pursuant to the CPT Assistant, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

84.     Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

85.     As set forth above, the CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i)      constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)     cardiovascular;

(v)      respiratory;

(vi)     gastrointestinal;

(vii)    genitourinary;

(viii)   musculoskeletal;

(ix)   integumentary (skin and/or breast);

(x)   neurological;

(xi)   psychiatric;

(xii)   endocrine;

(xiii)   hematologic/lymphatic; and

(xiv)   allergic/immunologic.

86.   When Defendants billed for the consultations under CPT codes 99244, 99245, and 99205, they falsely represented that a physician took a "comprehensive" patient history from the Insureds.

87.   In fact, no healthcare provider associated with Kolesnikov Medical took a "comprehensive" patient history from the Insureds they purported to treat during the consultations/examinations, because they did not document a review of 10 organ systems unrelated to the history of the patients' present illnesses.

88.   Rather, after purporting to provide the consultations, Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents. Even in the unlikely event that an Insured continued to suffer from injuries, there was no adequate neurological history and examination performed to create a foundation for the diagnostic testing.

89.   These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the Fraudulent Services that Defendants purported to provide and then billed to GEICO and other insurers.

      (e)    **Misrepresentations Regarding "Comprehensive" Physical Examinations**

90.    Moreover, and as set forth above, pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

91.    As set forth above, pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)    at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)    examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)    coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

92.     Though Kolesnikov Medical routinely billed for the initial examinations under CPT codes 99245, 99244, and 99205, and thereby falsely represented that they conducted a "comprehensive" physical examination of Insureds during the initial examinations, they did not conduct a general examination of multiple organ systems, inasmuch as they did not document findings with respect to at least ten organ systems.

93.     Furthermore, although Kolesnikov Medical often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during their putative initial examinations, the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

**(f)      Misrepresentations Regarding the Extent of Medical Decision-Making**

94.      In addition, when Kolesnikov Medical submitted charges for initial examinations under CPT codes 99245 and 99205, they represented that they engaged in medical decision-making of "high complexity."

95.      Similarly, when Kolesnikov Medical submitted charges for initial examinations under CPT code 99244, they represented that they engaged in medical decision-making of "moderate complexity."

96.      Pursuant to the CPT Assistant, medical decision-making does not qualify as "highly complex" unless the decision-making meets at least two of the following three criteria: (i) consideration of an extensive number of diagnoses or management options; (ii) review of either an extensive amount of data or data that are extensively complex; and/or (iii) presenting problems that carry a high risk of complications and/or morbidity or mortality.

97.      Along similar lines, pursuant to the CPT Assistant, medical decision-making does not qualify as "moderately complex" unless the decision-making meets at least two of the following three criteria: (i) consideration of multiple diagnoses or management options; (ii) review of either a moderate amount of data or data that are moderately complex; and/or (iii) presenting problems that carry a moderate risk of complications and/or morbidity or mortality.

98.      Pursuant to the CPT Assistant, the number of possible diagnoses and/or the number of management options that must be considered is based on the number and types of problems addressed during the encounter, the complexity of establishing a diagnosis, and the management decisions that are made by the physician. In addition, pursuant to the CPT Assistant, the amount and complexity of data that must be reviewed is based on the types of diagnostic testing that are ordered or reviewed.  Furthermore, pursuant to the CPT Assistant, the

risk of significant complications, morbidity, and/or mortality is based on the risks associated with the presenting problems, the diagnostic procedures, and the possible management options.

99.     Though Kolesnikov Medical routinely falsely represented that their initial examinations involved medical decision-making of "high complexity" (when billed under CPT codes 99245 and 99205) or "moderate complexity" (when billed under CPT code 99244), in actuality the initial examinations did not involve any medical decision-making at all.

100.    First, the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the Insureds presented to Kolesnikov Medical for "treatment," they did not arrive with any medical records. Furthermore, prior to the initial examinations, Kolesnikov Medical neither requested any medical records from any other providers, nor reviewed any diagnostic tests.

101.    Second, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

102.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Kolesnikov Medical, to the extent that Kolesnikov Medical provided any such diagnostic procedures or treatment options in the first instance. In almost every instance, any diagnostic procedures and "treatments" that Kolesnikov Medical actually provided were limited to a series of medically unnecessary pain management modalities and diagnostic tests, none of which were health or life-threatening if properly administered.

103.    Third, Kolesnikov Medical did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

104.   In fact, no physician associated with Kolesnikov Medical engaged in any medical decision-making at all. Rather, the outcome of the initial examinations were pre-determined for virtually every Insured to result in phony boilerplate "diagnoses" of sprains and strains.

105.   The initial examinations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of Fraudulent Services that Defendants purported to perform and then billed to GEICO and other insurers.

### 2.    The Fraudulent Follow-Up Examinations

106.   In addition to the fraudulent initial examinations, Kolesnikov Medical typically purported to subject Insureds to one or more fraudulent follow-up examinations during the course of its fraudulent treatment protocol.

107.   Kolesnikov Medical billed the examinations to GEICO under CPT codes: (i) 99214, typically resulting in a charge of $92.97; and (ii) 99215, typically resulting in a charge of $229.96.

108.   Like Defendants' charges for the initial examinations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the fraudulent treatment protocol established by Defendants.

109.   Pursuant to the Fee Schedule, the use of CPT codes 99214 and 99215 typically requires that the Insured present with problems of moderate-to-high severity.

110.   Though Defendants routinely billed for the follow-up examinations under CPT codes 99214 and 99215, the Insureds did not present with problems of moderate-to-high severity. Rather, the Insureds did not have medical problems at all as the result of any automobile accident.

111.   Furthermore, the use of CPT code 99214 typically requires that the physician spend 25 minutes of face-to-face time with the Insured or the Insured's family and CPT code 99215 typically requires that the physician spend 40 minutes of face-to-face time with the Insured or the Insured's family.

112.   Though Defendants routinely billed for the follow-up examinations using CPT code 99214 and 99215, no physician associated with Defendants ever spent 15 minutes, let alone 25 or 40 minutes of face-to-face time with the Insureds or their families during the follow-up examinations. Rather, the follow-up examinations rarely lasted more than ten minutes, to the extent that they were conducted at all.

113.   In addition, when Defendants submitted charges for the follow-up examinations under CPT code 99214, they falsely represented that they performed at least two of the following three components: (i) took a detailed patient history; (ii) conducted a detailed physical examination; and (iii) engaged in medical decision-making of "moderate complexity."

114.   When Defendants submitted charges for the follow-up examinations under CPT code 99215, they falsely represented that they performed at least two of the following three components: (i) took a comprehensive patient history; (ii) conducted a comprehensive physical examination; and (iii) engaged in medical decision-making of "high complexity."

115.   During the purported follow-up evaluation, no physician associated with Kolesnikov Medical took a "detailed" patient history or "comprehensive" patient history.

116.   Furthermore, during the purported follow-up evaluation, no physician associated with Kolesnikov Medical conducted a "detailed" or "comprehensive" patient examination.

117.    What is more, during the purported follow-up examinations, no physician associated with Kolesnikov Medical engaged in medical decision-making of moderate or high complexity.

118.    Instead, in most cases Defendants did not actually provide any legitimate follow-up examinations at all, and compiled phony boilerplate "follow-up examination" reports out of whole cloth to support their fraudulent treatment and billing protocol.

119.    The phony "follow-up examination" reports that Defendants compiled falsely suggested that the Insureds continued to suffer from injuries sustained in automobile accidents, and required additional Fraudulent Services in order to complete their recovery.

120.    These phony follow-up examinations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to continue to support the laundry-list of Fraudulent Services that Defendants purported to perform and then billed to GEICO and other insurers.

121.    Based on the fraudulent diagnoses, Defendants directed Insureds to return to the Flatlands Clinic several times per week for medically unnecessary diagnostic testing.

### 3.    The Fraudulent Computerized Range of Motion and Muscle Tests

122.    In an attempt to maximize the fraudulent billing that they submitted or caused to be submitted for each Insured, Kolesnikov Medical purported to subject Insureds to medically unnecessary computerized range of motion and muscle testing, typically at or near the dates on which Defendants purported to perform the initial examinations and follow-up examinations.

123.    Kolesnikov Medical then billed the computerized range of motion tests to GEICO as multiple charges of $45.71 under CPT code 95851, generally for each round of testing.

124.   Kolesnikov Medical billed the computerized muscle tests to GEICO as multiple charges of $43.60 under CPT code 95831 and/or $114.32 under CPT code 95833, generally for each round of testing.

125.   Like Defendants' charges for the other Fraudulent Services, the charges for the computerized range of motion and muscle tests were fraudulent in that the computerized range of motion and muscle tests were medically unnecessary and performed – to the extent that they were performed at all – pursuant to Defendants' fraudulent treatment protocol.

126.   In fact, Kolesnikov even testified that every patient receives ROM/MT without question.

### (a)   Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength

127.   The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety.  The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend the knee, rotate a shoulder, or move the neck to one side.

128.   The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion".  Stated in a more illustrative way, range of motion is the amount of movement at the joint.

129.   A traditional, or manual, range of motion test consists of a non-electronic measurement of the movement at the joint in comparison with an unimpaired or "ideal" joint.  In a traditional range of motion test, the physician asks the patient to move at his or her joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

130.     Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body or extremity in a given direction against resistance applied by the physician. For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he or she would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

131.     Physical examinations performed on patients with soft-tissue trauma necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a reference for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength is a component of the "hands-on" examination of a trauma patient.

132.     Since range of motion and muscle strength tests are conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the examinations. In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination, then bill separately for contemporaneously-provided range of motion and muscle tests.

### (b) Kolesnikov Medical's Duplicate Billing for Medically Unnecessary Computerized Range of Motion and Muscle Tests

133.    To the extent that Defendants actually provided the examinations that were billed to GEICO, Defendants conducted manual range of motion and manual muscle tests on each Insured during each examination.

134.    The charges for the manual range of motion and manual muscle tests were part and parcel of the charges that Kolesnikov Medical routinely submitted for the examinations under CPT codes 99205, 99244, and 99245, and for the follow-up examinations under CPT codes 99214 and 99215.

135.    Despite the fact that Insureds already purportedly had undergone manual range of motion and muscle testing during their examinations, and despite the fact that reimbursement for range of motion and muscle testing already had been paid by GEICO as a component of reimbursement for the examinations, Kolesnikov Medical systemically billed for, and purported to perform, computerized range of motion and muscle tests on Insureds.

136.    Though the Insureds routinely visited the Flatlands Clinic several times per month for follow-up examinations and other Fraudulent Services, Defendants often deliberately scheduled separate appointments for computerized range of motion and muscle tests so that they could bill for those procedures separately, without having to include them in the billing for the follow-up examinations, as required by the Fee Schedule.

137.    Kolesnikov Medical purported to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies while the Insured is asked to attempt various motions and movements.  The test is virtually identical to the manual range of motion testing that is described above and that purportedly was performed

during each examination, except that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion.

138.   Defendants purported to provide the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the Insured was asked to press three-to-four separate times using various muscle groups. As with the computerized range of motion tests, this computerized muscle strength test was virtually identical to the manual muscle strength testing that is described above and that purportedly was performed during the initial examinations and follow-up examinations – except that a digital printout was obtained.

139.   The information gained through the use of the computerized range of motion and muscle tests is not significantly different from the information obtained through the manual testing that was part and parcel of the Insured's examination.  In the relatively minor soft-tissue injuries allegedly sustained by the Insureds, the difference of a few percentage points in the Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing is meaningless.

140.   While computerized range of motion and muscle tests can be a medically useful tool as part of a research project, under the circumstances employed by Kolesnikov Medical it represented purposeful and unnecessary duplication of the manual range of motion and muscle strength testing purportedly conducted during the Insured's initial examination/consultation and follow-up examinations.

141.   The computerized range of motion and muscle tests were part and parcel of Defendants' interrelated fraudulent schemes, inasmuch as the "service" was rendered pursuant to a pre-established protocol that (i) amounted to purposeful and unnecessary duplication of the

manual range of motion and muscle strength testing purportedly conducted during the Insured's examinations; (ii) in no way aided in the assessment and treatment of the Insureds; and (iii) was designed solely to financially enrich Kolesnikov Medical.

**(c)  Kolesnikov Medical's Fraudulent Unbundling of Charges for the Computerized Range of Motion and Muscle Tests**

142.  Not only did Kolesnikov Medical deliberately purport to provide duplicative, medically unnecessary computerized range of motion and muscle tests, they also unbundled their billing for the tests in order to maximize the fraudulent charges that they submitted to GEICO.

143.  Pursuant to the Fee Schedule, when computerized range of motion testing and muscle testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

144.  CPT code 97750 is a "time-based" code that – in the New York metropolitan area – allows for a single charge of $45.71 for every 15 minutes of testing that is performed.  Thus, if a provider performed 15 minutes of computerized range of motion and muscle testing, it would be permitted a single charge of $45.71 under CPT code 97750. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges of $45.71 under CPT code 97750, resulting in total charges of $91.42, and so forth.

145.  If computerized range of motion and muscle testing is provided to an Insured separately, on different dates, then a healthcare provider may bill for the computerized range of motion testing under CPT code 95851, and may bill for the muscle testing under CPT code 95831 or 95833.  These codes are not time-based – instead, they are based on the number of extremities or body parts that are tested.

146.  Kolesnikov Medical purported to provide computerized range of motion and muscle tests to Insureds on the same dates of service.

147.    To the extent that Kolesnikov Medical actually provided the computerized range of motion and muscle tests to Insureds in the first instance, the computerized range of motion and muscle tests – together – generally never took more than 15 minutes to perform.  Thus, even if the computerized range of motion and muscle tests that Defendants purported to perform were medically necessary, and performed in the first instance, Defendants would be limited to a single, time-based charge of $45.71 under CPT code 97750 for each date of service on which they performed computerized range of motion and muscle tests on an Insured.

148.    In order to maximize their fraudulent billing for the computerized range of motion and muscle tests, Kolesnikov Medical unbundled what should be – at most – a single charge of $45.71 under CPT code 97750 for both computerized range of motion and muscle testing into: (i) multiple charges of $43.60 under CPT code 95831 and/or $114.32 under CPT code 95833 (for the muscle tests); and (ii) multiple charges of $45.71 under CPT code 95851 (for the range of motion tests).

149.    By unbundling what should – at most – be a single $45.71 charge under CPT code 97750 into multiple charges under CPT codes 95831, 95833, and 95851, Kolesnikov Medical typically inflated the fraudulent computerized range of motion and muscle strength testing charges that they submitted to GEICO.

150.    Furthermore, Kolesnikov Medical typically billed for CPT codes 95831 and 95833 on the same day on the same Insured, completely abusing the Fee Schedule to obtain ill-gotten gains.  CPT code 95831 specifically states, "[m]uscle testing, manual with report; extremity (excluding hand) or trunk."  CPT code 95833 specifically states, "[m]uscle testing, total evaluation of body, excluding hands."  Therefore, since one code is per trunk section and one code is for the entire body, there is no medical justification to bill for these CPT codes on the

same day for the same Insured.  However, Kolesnikov Medical repeatedly billed for CPT codes 95831 and 95833 on the same day for the same Insured.

151.   For example:

(i)    On March 24, 2015, Kolesnikov Medical purported to provide ROM (95851) and Muscle Testing (95831) to an Insured named "AA". On the same day, Kolesnikov Medical purported to provide Muscle Testing (95833), which they billed to GEICO, despite the fact that "AA" purportedly already had received a Muscle Test under CPT code 95831.

(ii)   On May 12, 2015, Kolesnikov Medical purported to provide ROM (95851) and Muscle Testing (95831) to an Insured named "SB". On the same day, Kolesnikov Medical purported to provide Muscle Testing (95833), which they billed to GEICO, despite the fact that "SB" purportedly already had received a Muscle Test under CPT code 95831.

(iii)  On May 5, 2015, Kolesnikov Medical purported to provide ROM (95851) and Muscle Testing (95831) to an Insured named "DB". On the same day, Kolesnikov Medical purported to provide Muscle Testing (95833), which they billed to GEICO, despite the fact that "DB" purportedly already had received a Muscle Test under CPT code 95831.

(iv)   On April 21, 2015, Kolesnikov Medical purported to provide ROM (95851) and Muscle Testing (95831) to an Insured named "AC". On the same day, Kolesnikov Medical purported to provide Muscle Testing (95833), which they billed to GEICO, despite the fact that "AC" purportedly already had received a Muscle Test under CPT code 95831.

(v)    On November 11, 2014, Kolesnikov Medical purported to provide ROM (95851) and Muscle Testing (95831) to an Insured named "KC". On the same day, Kolesnikov Medical purported to provide Muscle Testing (95833), which they billed to GEICO, despite the fact that "KC" purportedly already had received a Muscle Test under CPT code 95831.

(vi)   On April 21, 2015, Kolesnikov Medical purported to provide ROM (95851) and Muscle Testing (95831) to an Insured named "PC". On the same day, Kolesnikov Medical purported to provide Muscle Testing (95833), which they billed to GEICO, despite the fact that "PC" purportedly already had received a Muscle Test under CPT code 95831.

(vii)  On May 19, 2015, Kolesnikov Medical purported to provide ROM (95851) and Muscle Testing (95831) to an Insured named "MD". On the same day, Kolesnikov Medical purported to provide Muscle Testing

(95833), which they billed to GEICO, despite the fact that "MD" purportedly already had received a Muscle Test under CPT code 95831.

(viii)   On October 21, 2014, Kolesnikov Medical purported to provide ROM (95851) and Muscle Testing (95831) to an Insured named "PD". On the same day, Kolesnikov Medical purported to provide Muscle Testing (95833), which they billed to GEICO, despite the fact that "PD" purportedly already had received a Muscle Test under CPT code 95831.

(ix)   On March 24, 2015, Kolesnikov Medical purported to provide ROM (95851) and Muscle Testing (95831) to an Insured named "MF". On the same day, Kolesnikov Medical purported to provide Muscle Testing (95833), which they billed to GEICO, despite the fact that "MF" purportedly already had received a Muscle Test under CPT code 95831.

(x)   On April 4, 2013, Kolesnikov Medical purported to provide ROM (95851) and Muscle Testing (95831) to an Insured named "AX". On the same day, Kolesnikov Medical purported to provide Muscle Testing (95833), which they billed to GEICO, despite the fact that "AX" purportedly already had received a Muscle Test under CPT code 95831.

(xi)   On January 8, 2014 Kolesnikov Medical purported to provide ROM (95851) and Muscle Testing (95831) to an Insured named "DW". On the same day, Kolesnikov Medical purported to provide Muscle Testing (95833), which they billed to GEICO, despite the fact that "DW" purportedly already had received a Muscle Test under CPT code 95831.

(xii)   On February 12, 2014, Kolesnikov Medical purported to provide ROM (95851) and Muscle Testing (95831) to an Insured named "NW". On the same day, Kolesnikov Medical purported to provide Muscle Testing (95833), which they billed to GEICO, despite the fact that "NW" purportedly already had received a Muscle Test under CPT code 95831.

(xiii)   On July 18, 2013, Kolesnikov Medical purported to provide ROM (95851) and Muscle Testing (95831) to an Insured named "RT". On the same day, Kolesnikov Medical purported to provide Muscle Testing (95833), which they billed to GEICO, despite the fact that "RT" purportedly already had received a Muscle Test under CPT code 95831.

(xiv)   On December 18, 2013, Kolesnikov Medical purported to provide ROM (95851) and Muscle Testing (95831) to an Insured named "AS". On the same day, Kolesnikov Medical purported to provide Muscle Testing (95833), which they billed to GEICO, despite the fact that "AS" purportedly already had received a Muscle Test under CPT code 95831.

(xv)    On July 29, 2014, Kolesnikov Medical purported to provide ROM (95851) and Muscle Testing (95831) to an Insured named "JS". On the same day, Kolesnikov Medical purported to provide Muscle Testing (95833), which they billed to GEICO, despite the fact that "JS" purportedly already had received a Muscle Test under CPT code 95831.

(xvi)   On December 18, 2013, Kolesnikov Medical purported to provide ROM (95851) and Muscle Testing (95831) to an Insured named "PR". On the same day, Kolesnikov Medical purported to provide Muscle Testing (95833), which they billed to GEICO, despite the fact that "PR" purportedly already had received a Muscle Test under CPT code 95831.

(xvii)  On October 22, 2013, Kolesnikov Medical purported to provide ROM (95851) and Muscle Testing (95831) to an Insured named "SJ". On the same day, Kolesnikov Medical purported to provide Muscle Testing (95833), which they billed to GEICO, despite the fact that "SJ" purportedly already had received a Muscle Test under CPT code 95831.

**(d)    Defendants' Fraudulent Misrepresentations as to the Existence of Written, Interpretive Reports Regarding the Computerized Range of Motion and Muscle Tests**

152.    Not only were Defendants' charges for the computerized range of motion and muscle tests fraudulent because the tests were medically unnecessary, and the billing was fraudulently unbundled, but the charges also were fraudulent because they falsely represented that Defendants prepared written reports interpreting the test data.

153.    Pursuant to the Fee Schedule, when a healthcare provider submits a charge for computerized range of motion testing using CPT codes 95851 or for computerized muscle testing using CPT codes 95831 or 95833, the provider represents that it has prepared a written report interpreting the data obtained from the test.

154.    Though Defendants routinely submitted billing for the computerized range of motion and muscle tests using CPT codes 95851, 95831, and 95833, Kolesnikov Medical did not prepare written reports interpreting the data obtained from the tests.

155.   Kolesnikov Medical did not prepare written reports interpreting the data obtained from the tests because the tests were not meant to impact any Insured's course of treatment. Rather, to the extent they were performed at all, the tests were provided as part of Defendants' pre-determined fraudulent treatment protocol, and were designed solely to financially enrich Defendants at the expense of GEICO and other insurers.

**4.     The Fraudulent "Outcome Assessment Testing"**

156.   In addition to the other Fraudulent Services, Defendants subjected Insureds to medically useless "outcome assessment tests," generally on the same dates they purported to subject the Insureds to initial or follow-up examinations.

157.   Defendants billed the "outcome assessment tests" to GEICO through Kolesnikov Medical under CPT codes 99358 and 99354, generally resulting in a charge of $204.41 for each round of "testing."

158.   Like Defendants' charges for the other Fraudulent Services, the charges for the "outcome assessment tests" were fraudulent in that the tests were medically unnecessary and, even when actually performed, were performed pursuant to the fraudulent treatment protocol. In fact, Kolesnikov even testified that every patient receives outcome assessment tests without question.

159.   The "outcome assessment tests" that Defendants purported to provide Insureds were simply pre-printed, multiple-choice questionnaires on which the Insureds were invited to report the symptoms they purportedly were experiencing, and the impact of those symptoms on their lives.

160.   Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up evaluations, and since the "outcome

assessment tests" that Kolesnikov Medical purported to provide were nothing more than a questionnaire regarding the Insureds' history and physical condition, the Fee Schedule provides that the "outcome assessment tests" should have been reimbursed as an element of the initial evaluation and follow-up evaluation. In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination, then bill separately for contemporaneously-provided "outcome assessment tests."

161.    The information gained through the use of the "outcome assessment tests" that Kolesnikov Medical purported to provide was not significantly different from the information that Defendants purported to obtain during virtually every Insured's initial evaluation and follow-up evaluation.

162.    Under the circumstances employed by Kolesnikov Medical, the "outcome assessment tests" represented purposeful and unnecessary duplication of the patient histories purportedly conducted during the Insured's initial examination and follow-up examinations. The "outcome assessment tests" were part and parcel of Defendants' fraudulent scheme, inasmuch as the "service" was rendered pursuant to a pre-determined protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich Defendants.

163.    Kolesnikov Medical's use of CPT codes 99358 and 99354 to bill for the "outcome assessment tests" also constituted a deliberate misrepresentation of the extent of the service that was provided. Pursuant to the Fee Schedule, the use of CPT codes 99358 and 99354 represents – among other things – that the physician actually spent at least one hour performing some prolonged service, such as review of extensive records and tests, or communication with the patient and his or her family.

164.     Though Kolesnikov Medical routinely submitted billing for the "outcome assessment tests" under CPT codes 99358 and 99354, no physician associated with the Flatlands Clinic spent an hour reviewing or administering the tests.

165.     Nevertheless, Kolesnikov Medical submitted billing to GEICO for billing under CPT codes 99358 and 99354.

**5.     The Fraudulent Physical Performance Tests**

166.     Kolesnikov Medical and Kolesnikov also purported to perform Physical Performance Testing ("PPT") on Insureds.

167.     Kolesnikov Medical purported to provide PPT tests to Insureds despite their actual knowledge that the PPT tests, to the extent that they were performed at all, were medically unnecessary and duplicative of the range of motion and muscle strength tests that they performed during every examination and/or the computerized ROM/MT tests.

168.     The only substantive difference between the PPT tests and the manual range of motion and manual muscle strength tests provided by Defendants during the examinations is that the PPT tests generate a digital printout of an Insured's range of motion and/or muscle strength.

169.     The range of motion and muscle strength data obtained through the use of the PPT tests are not significantly different from the information obtained through the manual testing that was part of the examinations provided by Defendants to Insureds.

170.     In addition, the range of motion and muscle strength data obtained through the use of the PPT tests is not significantly different from the data that Defendants obtained through the computerized ROM/MT tests they purported to provide to Insureds.

**6.      The Fraudulent Neurological Consultations and Electrodiagnostic Testing**

171.      Based upon the fraudulent, pre-determined "diagnoses" that they purported to provide to Insureds during the ersatz initial "consultations", Defendants purported to subject Insureds in the claims identified in Exhibit "1" to a series of medically unnecessary electrodiagnostic tests, including NCV and EMG tests (collectively, the "electrodiagnostic" or "EDX" tests).

172.      Defendants virtually always billed to GEICO as multiple charges using CPT codes 95861, 95864, 95903, 95904, and 95934, almost always resulting in charges of at least $1,500.00, but usually more than $3,000.00, for each Insured on whom the electrodiagnostic testing purportedly is performed.

173.      Like the charges for the other Fraudulent Services, the charges for the neurological consultations and EDX tests were fraudulent in that the neurological consultations and EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to Defendants' pre-determined fraudulent treatment protocol that was designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

**(a)      The Human Nervous System and Electrodiagnostic Testing**

174.      The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

175.      Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit

signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

176.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

177.    Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

178.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs including pain, altered sensation, loss of muscle control, and alteration of reflexes.

179.    EMG tests and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

180.    The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

181.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional

medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

(b)    **The Fraudulent Charges for NCV Tests**

182.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin. An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and calculates the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity").

183.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

184.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

185.    F-wave and H-reflex studies are additional types of NCV tests that may be performed in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory nerve NCV tests are designed to evaluate nerve conduction in nerves within a limb.

186.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

187.    Even so, in an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, Defendants routinely purported to perform testing on far more nerves than recommended by the Recommended Policy.

188.    Specifically, to maximize the fraudulent charges they could submit to GEICO and other insurers, Defendants routinely purported to perform and/or provide: (i) NCV tests of 4-8 motor nerves; (ii) NCV tests of 4-10 sensory nerves; (iii) multiple F-wave studies; and (iv) at least two H-reflex studies, all supposedly to determine whether the Insureds suffered from a radiculopathy.

189.    For example:

(i)     On July 17, 2017, Kolesnikov Medical purported to provide 10 sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave studies, and two H-reflex studies to an Insured named "LA", supposedly to determine whether "LA" suffered from a radiculopathy.

(ii)    On February 1, 2016, Kolesnikov Medical purported to provide 10 sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave studies, and two H-reflex studies to an Insured named "KA", supposedly to determine whether "KA" suffered from a radiculopathy.

(iii)   On June 22, 2015, Kolesnikov Medical purported to provide 10 sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave studies, and two H-reflex studies to an Insured named "SB", supposedly to determine whether "SB" suffered from a radiculopathy.

(iv)    On November 23, 2015, Kolesnikov Medical purported to provide 10 sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave studies, and two H-reflex studies to an Insured named "JB", supposedly to determine whether "JB" suffered from a radiculopathy.

(v)     On September 27, 2016, Kolesnikov Medical purported to provide 10 sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave

studies, and two H-reflex studies to an Insured named "TG", supposedly to determine whether "TG" suffered from a radiculopathy.

(vi)    On January 17, 2017, Kolesnikov Medical purported to provide 10 sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave studies, and two H-reflex studies to an Insured named "CJ", supposedly to determine whether "CJ" suffered from a radiculopathy.

(vii)    On April 25, 2017, Kolesnikov Medical purported to provide 10 sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave studies, and two H-reflex studies to an Insured named "OW", supposedly to determine whether "OW" suffered from a radiculopathy.

(viii)    On December 13, 2016, Kolesnikov Medical purported to provide 10 sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave studies, and two H-reflex studies to an Insured named "LW", supposedly to determine whether "LW" suffered from a radiculopathy.

(ix)    On July 29, 2014, Kolesnikov Medical purported to provide 10 sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave studies, and two H-reflex studies to an Insured named "NB", supposedly to determine whether "NB" suffered from a radiculopathy.

(x)    On April 16, 2014, Kolesnikov Medical purported to provide 10 sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave studies, and two H-reflex studies to an Insured named "LP", supposedly to determine whether "LP" suffered from a radiculopathy.

(xi)    On November 6, 2013, Kolesnikov Medical purported to provide 10 sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave studies, and two H-reflex studies to an Insured named "AB", supposedly to determine whether "AB" suffered from a radiculopathy.

190.    Assuming that all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed health care professionals in the metropolitan New York area to submit maximum charges of: (i) $106.47 under CPT code 95904 for each sensory nerve in any limb on which NCVs test is performed; (ii) $166.47 under CPT code 95903 for each motor nerve with F-wave in any limb on which NCV testing is performed; and (iii) $119.99 under CPT code 95934 for each H-reflex test that is performed on the nerves of any limb.

191.    Defendants routinely purported to provide and/or perform NCVs on far more

nerves than recommended by the Recommended Policy in order to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the NCV tests were medically necessary to determine whether the Insureds have radiculopathies or any other medical condition.

192.    What is more, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

193.    In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

194.    As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

195.    This concept is emphasized in the Recommended Policy, which states that:

> EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

196.    This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

197.    Even so, Defendants did not tailor the NCV tests they purported to perform and/or provide to the unique circumstances of each individual Insured.

198.    Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCV tests on the same peripheral nerves and nerve fibers in the NCV test claims identified in Exhibit "1".

199.    Though the NCVs are allegedly rendered to Insureds in order to determine whether the Insureds suffered from radiculopathies, there was no adequate neurological history

and examination performed to create a foundation for the EDX testing. In actuality, NCV tests were provided to Insureds – to the extent that they provided them at all – as part of the pre-determined, fraudulent treatment protocol designed to maximize the billing that could be submitted for each Insured.

200.    The cookie-cutter approach to the NCV tests that Defendants purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCV tests was designed solely to maximize the charges that Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

### (c)      The Fraudulent Charges for EMG Tests

201.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

202.    Though, in some cases, Defendants purported to provide EMG tests to Insureds in order to determine whether the Insureds suffered from radiculopathies, Defendants did not take a proper history or examination of Insureds that would indicate radiculopathy symptoms or signs or any other medical problems arising from any automobile accidents.

203.    In actuality, to the extent that Defendants purported to provide EMG tests to Insureds at all, the tests were provided as part of Defendants' pre-determined, fraudulent treatment protocol designed to maximize the billing that they could submit for each Insured.

204.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be

tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

205.    Even so, Defendants did not tailor the EMG tests they purported to provide and/or perform to the unique circumstances of each patient. Instead, Defendants routinely tested the same muscles in the same limbs repeatedly, without regard for individual patient presentment.

206.    Furthermore, even if there were any need for any of these EMG tests, the nature and number of the EMG tests that Defendants purported to provide and/or perform grossly exceed the maximum number of such tests that should have been necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

207.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

207.    Nonetheless, in the claims for EMG tests identified in Exhibit "1", Defendants purported to provide and/or perform EMG tests on four limbs, in contravention of the Recommended Policy, solely in order to maximize the fraudulent billing that they could submit to GEICO.

208.    For example:

(i)      On November 6, 2013, Kolesnikov Medical purported to provide a four-limb EMG test to an Insured named "KJ", supposedly to determine whether "KJ" suffered from a radiculopathy.

(ii)     On January 9, 2014, Kolesnikov Medical purported to provide a four-limb EMG test to an Insured named "DW", supposedly to determine whether "DW" suffered from a radiculopathy.

(iii)   On August 12, 2014, Kolesnikov Medical purported to provide a four-limb EMG test to an Insured named "JA", supposedly to determine whether "JA" suffered from a radiculopathy.

(iv)   On September 8, 2015, Kolesnikov Medical purported to provide a four-limb EMG test to an Insured named "KM", supposedly to determine whether "KM" suffered from a radiculopathy.

(v)   On November 23, 2015, Kolesnikov Medical purported to provide a four-limb EMG test to an Insured named "JB", supposedly to determine whether "JB" suffered from a radiculopathy.

(vi)   On October 18, 2016, Kolesnikov Medical purported to provide a four-limb EMG test to an Insured named "LS", supposedly to determine whether "LS" suffered from a radiculopathy.

(vii)   On November 22, 2016, Kolesnikov Medical purported to provide a four-limb EMG test to an Insured named "SS", supposedly to determine whether "SS" suffered from a radiculopathy.

(viii)   On January 17, 2017, Kolesnikov Medical purported to provide a four-limb EMG test to an Insured named "CJ", supposedly to determine whether "CJ" suffered from a radiculopathy.

(ix)   On May 15, 2017, Kolesnikov Medical purported to provide a four-limb EMG test to an Insured named "KS", supposedly to determine whether "KS" suffered from a radiculopathy.

(x)   On August 7, 2017, Kolesnikov Medical purported to provide a four-limb EMG test to an Insured named "PE", supposedly to determine whether "PE" suffered from a radiculopathy.

(xi)   On September 18, 2017, Kolesnikov Medical purported to provide a four-limb EMG test to an Insured named "RD", supposedly to determine whether "RD" suffered from a radiculopathy.

209.   These are only representative examples. In the claims for EMG tests identified in Exhibit "1", Defendants routinely purported to perform and/or provide a grossly-excessive number of EMG tests to the Insureds, ostensibly to determine whether the Insureds suffered from radiculopathies.

210.    If all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed healthcare professionals in the metropolitan New York area to submit maximum EMG charges of: (i) $185.73 under CPT code 95860 if an EMG is performed on at least five muscles of one limb; (ii) $241.50 under CPT code 95861 if an EMG is performed on at least five muscles in each of two limbs; (iii) $314.34 under CPT code 95863 if an EMG is performed on at least five muscles in each of three limbs; and (iv) $408.64 under CPT code 95864 if an EMG is performed on at least five muscles in each of four limbs.

211.    Defendants frequently purported to perform and/or provide EMG tests on muscles in all four limbs for the Insureds solely to maximize the profits that they could reap from each such Insured.

212.    Not only did Defendants purport to provide four-limb EMGs to certain Insureds, they also unbundled their billing into two separate two-limb EMG charges of $241.50 per Insured, rather than a single four-limb EMG charge of $408.64.

213.    For example:

(i)    On July 17, 2017, Kolesnikov Medical purported to provide two separate two-limb EMG tests to an Insured named "LA", supposedly to determine whether "LA" suffered from a radiculopathy.

(ii)    On July 29, 2016 Kolesnikov Medical purported to provide two separate two-limb EMG tests to an Insured named "NA", supposedly to determine whether "NA" suffered from a radiculopathy.

(iii)    On December 20, 2016, Kolesnikov Medical purported to provide two separate two-limb EMG tests to an Insured named "CA", supposedly to determine whether "CA" suffered from a radiculopathy.

(iv)    On January 10, 2017, Kolesnikov Medical purported to provide two separate two-limb EMG tests to an Insured named "BA", supposedly to determine whether "BA" suffered from a radiculopathy.

(v)    On October 4, 2016, Kolesnikov Medical purported to provide two separate two-limb EMG tests to an Insured named "MA", supposedly to determine whether "MA" suffered from a radiculopathy.

(vi)    On August 14, 2015, Kolesnikov Medical purported to provide two separate two-limb EMG tests to an Insured named "NB", supposedly to determine whether "NB" suffered from a radiculopathy.

(vii)    On October 23, 2017, Kolesnikov Medical purported to provide two separate two-limb EMG tests to an Insured named "FB", supposedly to determine whether "FB" suffered from a radiculopathy.

(viii)    On November 2, 2015, Kolesnikov Medical purported to provide two separate two-limb EMG tests to an Insured named "CB", supposedly to determine whether "CB" suffered from a radiculopathy.

(ix)    On October 5, 2015, Kolesnikov Medical purported to provide two separate two-limb EMG tests to an Insured named "TD", supposedly to determine whether "TD" suffered from a radiculopathy.

(x)    On March 6, 2017, Kolesnikov Medical purported to provide two separate two-limb EMG tests to an Insured named "JY", supposedly to determine whether "JY" suffered from a radiculopathy.

(xi)    On January 28, 2014, Kolesnikov Medical purported to provide two separate two-limb EMG tests to an Insured named "AB", supposedly to determine whether "AB" suffered from a radiculopathy.

(xii)    On February 20, 2014, Kolesnikov Medical purported to provide two separate two-limb EMG tests to an Insured named "JE", supposedly to determine whether "JE" suffered from a radiculopathy.

214.    Thus, instead of charging $408.64 per Insured for a single, medically useless four-limb EMG, Defendants submitted total charges of $483.00 for two medically useless two-limb EMGs, resulting in an overcharge of almost $75.00 for Insureds who purportedly received the medically unnecessary EMGs.

215.    Further evidence that the EDX tests were fraudulent, medically unnecessary, and were performed pursuant to Defendants' pre-determined fraudulent treatment protocol, was the

fact, upon information and belief, they were performed in violation of the New York State Department of Health Office of Professional Medical Misconduct.

216.     Delys St. Hill, M.D., an employee of Kolesnikov Medical, was found guilty by the Office of Professional Medical Misconduct on August 25, 2016, of professional misconduct by having committed negligence on more than one occasion; ordering excessive EMG/NCV tests and treatments which were not warranted by the patient's condition; practicing fraudulently and failing to maintain accurate patient medical records. Dr. Hill's medical license was suspended ninety days and subject to probation for five years.

217.     The probation included being required to use a practice monitor. Specifically, Dr. Hill would only practice medicine when her practice was being monitored by a physician board certified in an appropriate specialty.  In the instant case, the practice monitor would be board certified in neurology or physical medicine and rehabilitation. Dr. Hill's probation was effective December 21, 2016.

218.     Not only was Kolesnikov not aware of the disciplinary issues plaguing Dr. Hill, upon information and belief, no practice monitor was assigned to Dr. Hill when she performed EDX tests on behalf of Kolesnikov Medical after December 21, 2016.

219.     For example:

(i)     On March 6, 2017, Dr. Hill, on behalf of Kolesnikov Medical purported to provide two 2-limb EMGs, ten sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave studies, and H-reflex studies to an Insured named "JY", without the use of a practice monitor.

(ii)     On May 8, 2017, Dr. Hill, on behalf of Kolesnikov Medical purported to provide two 2-limb EMGs, seven sensory nerve NCV tests, five motor nerve NCV tests, multiple F-wave studies, and H-reflex studies to an Insured named "CG", without the use of a practice monitor.

(iii)     On June 5, 2017, Dr. Hill, on behalf of Kolesnikov Medical purported to provide two 2-limb EMGs, ten sensory nerve NCV tests, eight motor nerve NCV tests,

multiple F-wave studies, and H-reflex studies to an Insured named "CJ", without the use of a practice monitor.

(iv)   On July 10, 2017, Dr. Hill, on behalf of Kolesnikov Medical purported to provide a 4-limb EMG, ten sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave studies, and H-reflex studies to an Insured named "NJ", without the use of a practice monitor.

(v)    On August 7, 2017, Dr. Hill, on behalf of Kolesnikov Medical purported to provide one 2-limb EMG, ten sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave studies, and H-reflex studies to an Insured named "LD", without the use of a practice monitor.

(vi)   On September 11, 2017, Dr. Hill, on behalf of Kolesnikov Medical purported to provide one 4-limb EMG, ten sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave studies, and H-reflex studies to an Insured named "DD", without the use of a practice monitor.

(vii)  On October 9, 2017, Dr. Hill, on behalf of Kolesnikov Medical purported to provide two 2-limb EMGs, ten sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave studies, and H-reflex studies to an Insured named "AC", without the use of a practice monitor.

(viii) On November 13, 2017, Dr. Hill, on behalf of Kolesnikov Medical purported to provide one 4-limb EMG, ten sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave studies, and H-reflex studies to an Insured named "RD", without the use of a practice monitor.

(ix)   On December 4, 2017, Dr. Hill, on behalf of Kolesnikov Medical purported to provide two 2-limb EMGs, ten sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave studies, and H-reflex studies to an Insured named "LG", without the use of a practice monitor.

(x)    On December 18, 2017, Dr. Hill, on behalf of Kolesnikov Medical purported to provide two 2-limb EMGs, ten sensory nerve NCV tests, eight motor nerve NCV tests, multiple F-wave studies, and H-reflex studies to an Insured named "TM", without the use of a practice monitor.

220.   Dr. Hill's actions on behalf of Kolesnikov Medical come as no surprise considering Kolesnikov actually testified that:

- He never hired any of the physicians or technicians who performed the EMG/NCV tests for Kolesnikov Medical.

- He did not know how he met any of the physicians or technicians who performed the EMG/NCV tests for Kolesnikov Medical.

- He was unaware that one of the physicians performing the EMG/NCV tests was actually board certified in obstetrics and gynecology.

- He was completely unaware that Kolesnikov Medical wrote checks to companies owned by technicians who performed the EMG/NCV tests.

### III.  The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO

221.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3, HCFA-1500 forms, and/or treatment reports through Kolesnikov Medical to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

222.    The NF-3, HCFA-1500 forms, and/or treatment reports submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

(i)     The NF-3, HCFA-1500 forms and supporting documentation misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were provided pursuant to pre-determined protocols that were subject to direction and control by unlicensed persons that financially enriched Defendants, rather than legitimately treat or otherwise benefit the Insureds; and

(ii)    The NF-3, HCFA-1500 forms and supporting documentation submitted to GEICO by and on behalf of Defendants misrepresented and exaggerated the level of service and the nature of the service that purportedly was provided.

### IV.  Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

223.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

224.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

225.    Specifically, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted.

226.    In addition, in every bill that Defendants submitted or caused to be submitted, Defendants uniformly concealed the fact that Defendants misrepresented and exaggerated the level and nature of the services purportedly provided, and inflated the billing to insurers.

227.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

228.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

229.    Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

230.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation

activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1,445,000.00 based upon the fraudulent charges.

231.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
### Against Kolesnikov Medical
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

232.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

233.    There is an actual case in controversy between GEICO and Kolesnikov Medical regarding more than $737,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO.

234.    Kolesnikov Medical has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

235.    Kolesnikov Medical has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

236.    Kolesnikov Medical has no right to receive payment for any pending bills submitted to GEICO because the fraudulent, pre-determined treatment and billing protocols were

subject to the direction and control of persons that were not licensed to practice medicine, resulting in the performance and billing for unnecessary and inflated charges to GEICO.

237.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)    Kolesnikov Medical has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were medically unnecessary and were ordered and performed – to the extent that they were performed at all – pursuant to fraudulent, pre-determined protocols designed solely to maximize charges to GEICO and other insurers, not because they were medically necessary or designed to facilitate the treatment of or otherwise benefit the Insureds who purportedly have been subjected to them;

(ii)    Kolesnikov Medical has no right to receive payment for any pending bills submitted to GEICO because the CPT codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(iii)    Kolesnikov Medical has no right to receive payment for any pending bills submitted to GEICO because the fraudulent, pre-determined treatment and billing protocols were subject to the direction and control of persons that were not licensed to practice medicine, resulting in the performance and billing for unnecessary and inflated charges to GEICO.

## SECOND CAUSE OF ACTION
### Against Sabina, Yousef and Kolesnikov
### (Violation of RICO, 18 U.S.C. § 1962(c))

238.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

239.    Kolesnikov Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

240.    Sabina, Yousef and Kolesnikov knowingly have conducted and/or participated, directly or indirectly, in the conduct of Kolesnikov Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of

fraudulent charges on a continuous basis for over two years seeking payments that Kolesnikov Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) the fraudulent, pre-determined treatment and billing protocols were subject to the direction and control of persons that were not licensed to practice medicine, resulting in the performance and billing for unnecessary and inflated charges to GEICO. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

241. Kolesnikov Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Sabina, Yousef and Kolesnikov operated Kolesnikov Medical, inasmuch as Kolesnikov Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Kolesnikov Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Kolesnikov Medical to the present day.

242. Kolesnikov Medical is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to engage in fraudulent billing.

Kolesnikov Medical likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Kolesnikov Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

243.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,445,000.00 pursuant to the fraudulent bills submitted by the Defendants through Kolesnikov Medical.

244.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Sabina, Yousef and Kolesnikov**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

245.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

246.    Kolesnikov Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

247.    Sabina, Yousef, and Kolesnikov are employed by and/or associated with Kolesnikov Medical.

248.    Sabina, Yousef, and Kolesnikov knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Kolesnikov Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking

payments that Kolesnikov Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) the fraudulent, pre-determined treatment and billing protocols were subject to the direction and control of persons that were not licensed to practice medicine, resulting in the performance and billing for unnecessary and inflated charges to GEICO.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

249.    Sabina, Yousef, and Kolesnikov knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

250.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,445,000.00 pursuant to the fraudulent bills submitted by Defendants through Kolesnikov Medical.

251.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Sabina, Yousef, Kolesnikov and Kolesnikov Medical**
**(Common Law Fraud)**

252.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

253.     Sabina, Yousef, Dr. Kolesnikov and Kolesnikov Medical intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

254.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed pursuant to pre-determined protocols that were subject to direction and control by unlicensed persons which enriched Defendants; and (ii) in every claim, the representation that the billing appropriately reflected the level of services performed, when in fact the billing codes used for the Fraudulent Services and the manner in which the services were described misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

255.     Sabina, Yousef, Dr. Kolesnikov and Kolesnikov Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Kolesnikov Medical that were not compensable under the No-Fault Laws.

256.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,445,000.00 pursuant to the fraudulent bills submitted by Defendants through Kolesnikov Medical.

257.    Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

258.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Sabina, Yousef, Kolesnikov and Kolesnikov Medical**
**(Unjust Enrichment)**

259.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

260.    As set forth above, Sabina, Yousef, Dr. Kolesnikov and Kolesnikov Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

261.    When GEICO paid the bills and charges submitted by or on behalf of Kolesnikov Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

262.    Sabina, Yousef, Dr. Kolesnikov and Kolesnikov Medical have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

263.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

264.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,445,000.00.

## JURY DEMAND

265.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Kolesnikov Medical, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Kolesnikov Medical has no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Sabina, Yousef and Kolesnikov, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,445,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Sabina, Yousef and Kolesnikov, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,445,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Sabina, Yousef, Kolesnikov and Kolesnikov Medical, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,445,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.    On the Fifth Cause of Action against Sabina, Yousef, Kolesnikov and Kolesnikov

Medical, more than $1,445,000.00 for unjust enrichment, plus costs and interest and such other

and further relief as this Court deems just and proper.

Dated: March 1, 2019

RIVKIN RADLER LLP

By:_____
Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Frank P. Tiscione, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

4144496 v2